UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RODRIGO MONTOYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:20-CV-01108-AGF |
| | ) | |
| SLOAN VALVE COMPANY, d/b/a FLUSHMATE, | ) | |
| | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COTTLEVILLE VENTURES, L.L.C., | ) | |
| | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM AND ORDER

The matter is now before the Court on Defendant/Third-Party Plaintiff Sloan

Valve Company d/b/a Flushmate's motion for partial summary judgment on punitive

damages in this personal injury lawsuit invoking the Court's diversity jurisdiction.   The

Court heard oral argument on October 18, 2022.   For the reasons set forth below, this

motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Rodrigo Montoya ("Montoya") filed this action against Defendant Sloan

Valve Company, d/b/a Flushmate ("Sloan"), in August 2020, asserting claims of strict

products liability and negligence after a toilet tank containing a pressure valve

manufactured by Sloan exploded while Plaintiff was installing it, causing the lid to strike

Plaintiff in the face, resulting in multiple fractures to his jaw, lacerations to his chin, and

several broken teeth.   The pressure valve in question[1] had been the subject of a product recall and distribution of repair kits to customers.   Plaintiff is seeking both actual and punitive damages from Sloan.

Third-party Defendant Cottleville Ventures owned the business premises where the incident occurred.   Cottleville received repair kits in April 2014, but never installed one in the Subject Product which had been placed in storage for several years.   In April 2020, Cottleville hired Plaintiff, a longtime handyman for the business, to reinstall the tank.   After Plaintiff installed the tank and reconnected the supply line, the valve failed and the tank exploded as Plaintiff stood over it.

Sloan filed a third-party complaint against Cottleville asserting (1) contributory negligence and indemnification for Cottleville's failure to install the repair kit and failure to inform Plaintiff about the recall or the dangerous condition, and (2) negligence per se for Cottleville's alleged violation of county and city ordinances requiring licensed plumbers to obtain permits to perform the work that resulted in Plaintiff's accident.

Defendant Sloan has moved for partial summary judgment on Plaintiff's punitive damages claims, arguing that Plaintiff has failed to meet its burden for submission of punitive damages.

**Sloan's Development of the Pressure Valve**

Sloan is a water conservation company that makes commercial flush valves and faucets.   Flushmate is a division of Sloan that designs and manufactures pressure-assist

---

[1] The pressure valve in question is the Flushmate III 503 Series, Generation 3 Model, Model No. M-101526-F3, Serial No. 1110804-F3A-1293 (the "Subject Product").

toilet flushing systems including the Subject Product.   Sloan's pressure-assist toilet flushing systems, including the Subject Product, are comprised of a two-piece welded plastic vessel molded from 30% glass-filled polypropylene that operates by trapping air as it fills with water and uses air pressure to force water into the bowl, pushing waste out.   The Subject Product was manufactured on November 8, 2004.

The Subject Product is part of a specific generation in a line of Flushmate valves manufactured by Sloan, the Flushmate III 503, Generation 3.   Prior to the production of the Subject Product, Sloan manufactured the Flushmate II 501-B Series, and the Flushmate III, Generations 1 and 2.

**Flushmate II 501 B Series**

The Flushmate II 501-B Series began production in 1996 and was designed for larger porcelain tanks.   The Flushmate II vessels were manufactured using a vibration weld method.   The vibration weld method is a friction weld which involves the rapid oscillation between two mated pieces under very high pressure.   This relative motion generates frictional heat that is used to fuse pieces together.

The Flushmate II 501-B Series was discontinued in 2013 due to declining sales. Prior to the production of the Subject Product in 2004, Sloan received 1,085 reports of the Flushmate II 501-B Series separating or bursting in the field.   The Flushmate II 501-B Series was recalled on October 18, 2018, due to risk of bursting at or near the weld seam releasing stored pressure.   The recall notice warned that the pressure can lift the tank lid and shatter the tank, posing impact and laceration hazards to consumers and property damage.   (Doc. No. 115-9).

3

**Flushmate III, Generation 1**

The subsequent model of the Flushmate vessels the Flushmate III, Generation I, began production in October 1997.   Prior to the production of the Flushmate III, Sloan hired outside consulting and engineering firms to help with the development and testing of the Flushmate III product.   (Doc. 115-3, 74:10-77:1).   One of the primary goals for Sloan was decreasing the size of the vessel.   (Doc. 115-3, 75:20-77:1).

Sloan considered different shapes for the Flushmate III vessels, such as a more spherical shape which would distribute pressure more evenly.   (Doc. No. 115-3, 77:2-18).   However, Sloan ultimately decided against changing the shape because the vessel would then lack the volume required for its pressure application given the constraints of the toilet tank's size and shape.   (*Id.*).

Like its predecessor, the Flushmate III, Generation 1 also used vibration welding.   In addition to the incident reports involving the Flushmate II 501-B, Sloan began receiving complaints of failures (bursts) involving the Flushmate III, Generation 1.   There were approximately 385 bursting incidents reported involving the Flushmate III, Generation 1 prior to November 8, 2004.   Of the 1,411 incidents between this model and the Flushmate II 501-B, there were 33 reports of injuries.   Sloan discontinued the Flushmate III, Generation 1 on June 19, 2000.

In a memo dated October 12, 1998, "JB" (believed to be Joseph Boseman, then President of Flushmate) stated the following:

> If the numbers present on this report are valid, this is very alarming. It appears we may lose on average 25% of the original material strength in a relatively short period of time. The unknowns are 'will it continue to

4

degrade?' 'how much?' and 'over what period of time?' Finally, at what point will the degradation result in failure?

(Doc. No. 121-5, p. 2).

In another memo dated May 24, 1999, an engineer from Flushmate's plastic manufacturer recommend a number of changes to address the low burst pressure rate in the Flushmate III.   The memo stated that Flushmate could: (1) "locally increase the wall thickness," which would "give the desired results with a minimum impact in cost"; (2) "switch materials, which has the best potential to see a major leap in performance but is also a costly step"; (3) "add ribs to increase the part stiffness" which "has the potential to create sealing problems with a small gain in burst strength."   (Doc. No. 121-7).

Sloan conducted evaluations on different potential failure modes and investigations into the potential causes.   (Doc. 115-4, 276:23-277:8).   According to Sloan's expert, Dr. Gregory Chojecki, once Sloan appeared to better understand what they believed to be the cause of the failures, they worked with their various suppliers, including their resin supplier and mold supplier, to eradicate the observed variances. (Doc. 115-5, p. 20).   Sloan observed that the vibration welded Flushmates typically experienced failures directly at the vibration weld site.   (*Id*.)   Sloan evaluated increasing the dimension of the welded area to improve its strength, but when this did not resolve the issue, Sloan implemented a different weld design using the EmaBond weld technology.   (*Id*.).   EmaBond technology uses a tongue and groove shear joint design that results in a joint that Sloan expected to be more conducive to long-term

5

reliability.   Dr. Chojecki testified that Sloan determined the EmaBond welded vessel walls would fail before the EmaBond joint failed, which is contrary to the vibration welded vessels.   (Doc. No. 115-4, 119:4-120:15).   The transition to EmaBond was purportedly to correct a welding problem that Sloan thought was causing the bursting failures.

**Flushmate III, Generation 2**

Sloan began manufacturing the Flushmate III, Generation 2 on June 20, 2000, using the Emabond welding technology.   By August 15, 2001, Sloan had received two incident reports related to this generation.   Neither report involved an injury.   Sloan discontinued the Flushmate III, Generation 2 on October 17, 2001.

In an interoffice memo dated August 16, 2000, Flushmate contacted an engineer from their tool maker, American Molded Products, to evaluate alternative materials. (Doc. No. 121-9).   The engineer stated that "polypropylene will creep and fatigue even at room temperatures.   I believe this makes polypropylene a poor material choice," and suggested that Flushmate instead use a polyester.   The engineer also recommended other various changes to increase the strength and burst pressure.   (*Id.*)

Prior to the production of the Flushmate III, Generation 3, Sloan changed the vessel design to add "railroad tracks," or pattern or ridges around the circumference of the region where the vessel's upper and lower halves are joined.   Sloan's corporate representative, Jerome Sobolowski stated that the railroad tracks were added to aid in the molding process and were composed of "little cutouts to slow down the flow of material during the molding process." (Doc. 115-3, 143:8-21).   Whereas Dr. Chojecki

6

testified that ridges can be added for rigidity, additional support and/or stabilization, which may have an impact on the vessel's overall integrity.   (Doc. 115-4, 269:15-270:8).

### Flushmate III, Generation 3

Sloan began manufacturing the Flushmate III, Generation 3 on October 18, 2001.   The Subject Product was manufactured on November 8, 2004.   Prior to this November 8, 2004 date, Sloan had not received any reports of incidents involving the Flushmate III, Generation 3, and had only received one more report of an incident involving the Flushmate III, Generation 2, which did not involve injury.

At the time Sloan manufactured the Subject Product in 2004, its internal burst pressure standard was 200 PSI.   By August 2004, Sloan reports it had improved the average burst pressure on the Flushmate III, Generation 3 to 246 PSI.   Sloan also reports that the burst testing showed that none of the vessels' bursts were occurring at or near the weld.   On the date the Subject Product was manufactured, Sloan reports that burst testing conducted on three Flushmate III, Generation 3 vessels demonstrated burst pressures of 224 PSI, 237 PSI, and 217 PSI.   The regular operating pressure for the vessels was 30 to 35 PSI and the vessels were fitted with a pressure relief valve that was set at 60 PSI.

### Flushmate III Recall

On June 21, 2012, Sloan, in partnership with the United States Consumer Product Safety Commission ("CPSC") and Health Canada, recalled the Flushmate III products due to repeated bursting incidents in the field.   The recall included units

7

manufactured from October 1997 to February 2008.   The recall stated "[t]he system can burst at or near the vessel weld seam releasing stored pressure.   This pressure can lift the tank lid and shatter the tank, posing impact and laceration hazards to consumers and property damage."   (Doc. No. 115-8, p. 1).   By the date of the recall, Sloan received 304 reports of the Flushmate III, Generation 3 products bursting in the field, 14 of which included reports of injuries.[2]   As part of the recall, Sloan distributed a free, CPSC-approved repair kit to be installed on the flushing device.   Sloan expanded the recall in January 2014 and July 2016 to include additional Generation 3 products.   In connection with the expanded recalls, Sloan sent information to the public, retailers, plumbing companies, and owners notifying them to stop using toilets containing the flushing device and instructing them to request a free repair kit.

As explained by Sloan's own expert, Dr. Chojecki, the repair kit is a two-part repair kit, which contains an external regulator and a metal U band "with the intent that the external regulator would reduce pressure in the tank, therefore reducing the overall amount of stored energy that could be released in a rupture event, as well as the metal U band being present which would help contain a rupture event and ideally reduce the potential effects of a rupture event."   (Doc. No. 115-4, 253:9-254:4).

**Plaintiff's Installation of the Tank**

The Subject Product was manufactured and shipped to American Standard on November 8, 2004 and subsequently sent to Third-Party Defendant Cottleville

---

[2] The recall does not differentiate which generations of the Flushmate III were experiencing bursting incidents.

Ventures.   At some point, the Subject Product was removed from service at Cottleville and placed in storage due to renovations.   In 2014, the owner of Cottleville Ventures, Mike Reiter Sr., contacted Sloan to register 14 flushing units as part of the recall process, including the Subject Product.   In response, Flushmate shipped 13 repairs kits and one complete replacement unit to Cottleville on or about April 21, 2014; this shipment included a repair kit for the Subject Product.

On April 14, 2020, Plaintiff was re-installing the Subject Product in an American Standard toilet at Cottleville.   During or shortly after the installation process, the Subject Product ruptured, causing the porcelain tank to explode as Plaintiff was standing over it, resulting in several facial lacerations, broken teeth, and jaw fractures.

On September 15, 2020, the Parties participated in an inspection of the Subject Product which confirmed that the repair kit had not been installed on the Subject Product prior to the incident.

Cottleville owner, Mr. Reiter, testified that he was aware of the recall and did receive the repair kits, but that he did not provide Mr. Montoya with a repair kit for the Subject Product.   He testified that Cottleville was not using the repair kits because the kits they previously installed in other units led to complaints from the tenants that the toilets would not flush properly.

**Post-Recall Reports & Findings**

During the recall, Sloan commissioned a third-party analysis by Exponent, an engineering consulting company.   Exponent issued an initial report on March 2, 2012 and an updated report on November 14, 2013.   It was determined that the root cause of

the ruptures in the Flushmate III Emabond vessels, Generations 2 and 3, was a tight radius of curvature leading to the vessels' weld immediately under the weld seam, which concentrated the stress in that area of the vessel and caused creep[3] and/or fatigue, ultimately resulting in the vessel separations.

Exponent found that there was radius variation within the Flushmate III, Generation 3 vessels, and many of the radii investigated were smaller than the print specification for that part.   It is believed that the radius variation was most likely the result of the manufacturing process.   A tighter radius raises stress in that particular area, which may cause the vessel to stretch and lose strength over time due to creep. All plastics experience creep, but the extent of to which they do differs between materials.   Creep can ultimately cause a vessel to burst.   The Subject Product burst in part because of creep.   A small radius on the vessel's lower half under the weld seam led to the formation of an initial crack that slowly grew until the remaining cross-section was no longer able to resist the imposed stress, resulting in a sudden final rupture.   (Doc. No. 115-5, p. 16).

Sloan claims that prior to Exponent's discovery of the radii issues, Sloan had not identified, nor been told that there was a tight radius in some vessels that was causing them to burst, despite its daily testing and evaluations on various models and prototypes.

---

[3] Creep is the mechanism by which a material loses its mechanical strength over time.

## ARGUMENTS OF THE PARTIES

Sloan argues that Plaintiff's claim for punitive damages fails as a matter of law because Plaintiff cannot establish that (1) Sloan knew of the defect in the Subject Product, nor that (2) Sloan should have known that manufacturing and selling the Subject Product created a high degree of probability of injury.   Specifically, Sloan argues that it lacked actual knowledge of the Subject Product's defect because there were no previous reports of bursts or injuries with respect to the specific model and generation at issue, and that its knowledge of creep does not equate to the requisite knowledge of the root cause or specific defect.   Sloan likewise argues that because it engaged in continuous improvement activities for Flushmate products, shipped free repair kits to consumers when it learned of the issues, and did not violate any statutes or regulations, their conduct cannot reasonably be construed as outrageous because of evil motive or reckless indifference.

In response, Plaintiff argues that he has sufficient evidence to support his claim for punitive damages.   Specifically, Plaintiff argues that Sloan had actual knowledge of the defect in its products – that the valves were bursting at or near the weld seam in the field in substantial numbers and causing injuries – and continued to sell them into the stream of commerce for over a decade.   Plaintiff argues that the problem with the Subject Product was related to creep in the materials used and the shape of the vessel, and that Sloan knew of these issues for years and continued to sell products.   Plaintiff points to testimony from a Sloan corporate representative, as well as internal memorandums and reports to show that Sloan had actual knowledge of the defect.   Lastly, Plaintiff argues

that Sloan's motion relies heavily on inadmissible opinion testimony from its expert, Dr.

Chojecki.   Specifically, that Chojecki's opinion evidence regarding Sloan's knowledge

is an inadmissible state of mind opinion and therefore cannot be used to prove whether or

not Sloan had knowledge of the defect.[4]

Additional facts and arguments are recited below as relevant to particular issues.

## **DISCUSSION**

### **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).   "[T]he burden of demonstrating there are no genuine issues of

material fact rests on the moving party, and we review the evidence and the inferences

which reasonably may be drawn from the evidence in the light most favorable to the

nonmoving party."   *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015) (citation

omitted).   To avoid summary judgment, the nonmovant has the "burden of presenting

evidence sufficiently supporting the disputed material facts that a reasonable jury could

return a verdict in their favor."   *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010

(8th Cir. 1992) (citation omitted).   "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

---

[4] The admissibility of Dr. Chojecki's testimony was the subject of a Daubert motion
(Doc. No. 109). The Court has ruled on this motion and ordered that Chojecki may not
opine on Sloan's knowledge or state of mind but may testify as to whether particular
circumstances would generally provide notice of defects. (Doc. No. 150).

quotation marks and citation omitted).   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."   *Combs v. Cordish Cos.*, 862 F.3d 671, 680 (8th Cir. 2017) (citation omitted).

## Punitive Damages Under Missouri Law

Under Missouri Law,[5] the "test for punitive damages in a products liability case is a strict one."   *Angotti v. Celotex Corp.,* 812 S.W.2d 742, 746 (Mo. Ct. App. 1991) (citing *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397 (Mo. Banc 1987).   The plaintiff must show (1) some element of outrageous conduct by the defendant and (2) that the defendant acted with a "willful, wanton or malicious culpable mental state."   *Poage v. Crane Co.*, 523 S.W.3d 496, 516 (Mo. Ct. App. 2017) (citation omitted).

"Under both negligence and strict liability theories, the plaintiff must demonstrate that the defendant showed a complete indifference to or conscious disregard for the safety of others."   *Jone v. Coleman Corp.,* 183 S.W.3d 600, 610 (Mo. Ct. App. 2005). However, the requisite knowledge under each theory differs. In a strict liability action, punitive damages can be awarded if the plaintiff establishes that the defendant "placed into commerce an unreasonably dangerous product, with *actual knowledge* of the product's defect."   *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 24 (Mo. Ct. App. 2006) (emphasis added) (citation omitted).   "In a negligence action, punitive damages may be awarded if the defendant *knew or had reason to know* a high degree of probability existed

---

[5] The parties agree that Missouri substantive law governs this diversity action.

13

that an action would result in injury."  *In re NuvaRing%2F Prods. Liab. Litig.*, 957 F.

Supp. 2d 1110, 1117 (E.D. Mo. 2013) (emphasis added); *see also Hoover's Dairy, Inc. v.*

*Mid-Am. Dairymen, Inc.*, 700 S.W.2d 426, 436 (Mo. Banc 1985).

Additionally, punitive damages require clear and convincing proof.  *Rodriguez v.*

*Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. Banc 1996) (explaining that punitive

damages require a higher standard of proof because they are "extraordinary and harsh").

The clear and convincing standard requires evidence "which instantly tilts the scales in

the affirmative when weighed against evidence in opposition; evidence which clearly

convinces the fact finder of the truth of the proposition to be proved."  *Coon v. Am.*

*Compressed Steel, Inc.*, 207 S.W.3d 629, 637 (Mo. Ct. App. 2006) (quoting *Peters*, 200

S.W.3d at 25).

In sum, a submissible case of punitive damages is made if the evidence and

inferences drawn therefrom are "sufficient to permit a reasonable juror to conclude that

the plaintiff established with convincing clarity—that is, that it was highly probable—that

the defendant's conduct was outrageous because of evil motive or reckless indifference."

*Peters*, 200 S.W.3d at 25.

## Punitive Damages -Strict Liability

The first element in showing a submissible case of punitive damages for strict

liability is demonstrating that the defendant had *actual knowledge* of the defect.   "No

Missouri case has permitted submission of a punitive damage claim in a strict products

liability case on the theory that the defendant should have known of a dangerous defect in

its product."  *School Dist. of City of Independence, Mo., No. 30 v. U.S. Gypsum Co.,* 750

14

S.W.2d 442, 446 (Mo. Ct. App. 1988).

In *Peters*, the court did not allow punitive damages for strict liability.   The court found that the Defendants did not have actual knowledge of the specific design defect, even though two of defendant's engineers testified that they reported concerns to defendant about the subject cruise control system, and 74 reports involving cruise control incidents were admitted into evidence.   *Peters*, 200 S.W.3d at 27.   "[Defendant] must have had actual knowledge of the cruise control's dangerous proclivity to permit a transient charge to enter the device and cause the vehicle on which it was installed to accelerate without driver input . . ."  *Id.*; *c.f. Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1336 (8th Cir. 1985) (finding submissible punitive damages on strict liability claim because prior to the manufacture of the subject product, there was evidence of (1) internal memorandums regarding similar incidents of the subject product, (2) a patent application acknowledging the hazard of the subject product, and (3) a training video acknowledging that a user would not be able to tell if the subject product was properly assembled).

In *Sparks v. Consol. Aluminum Co.,* 679 S.W.2d 348, 354 (Mo. Ct. App. 1984), a product liability case involving slipping ladder feet, the court found that an engineer's testimony that there had been other claims of injury and that there might have been a better material than what was used in the product at issue was insufficient.   The court noted that the evidence of other claims was too vague to establish actual knowledge of the particular danger at issue, and the product was tested and certified and met applicable standards.  *Id.* at 354.   In *Lewis v. Envirotech Corp.,* 674 S.W.2d 105, 114 (Mo. Ct.

15

App. 1984), the plaintiff asserted a "failure to test" theory, but the court held that evidence of defendant's reliance on field tests and service reports rather than simulated tests was insufficient to submit the issue of punitive damages to the jury.

Following bursting reports in the Flushmate II, and Flushmate III, Generation 1, Sloan transitioned to an Emabond weld in order to create a more robust joint.   (Doc. No. 115-13, p. 3) ("EMAweld technology offers a joint design more conducive to long-terms reliability given the Flushmate application (pressure vessel)").

After two reports of ruptures in the Emabond welded Flushmate III, Generation 2, Sloan began manufacturing the third generation of the Flushmate III.   The only change between these models was the addition of "railroad" tracks on the sidewall.   It is unclear from the record whether this change was done simply to improve the molding process or if it was done to strengthen the joint in an attempt to fix the bursting issue.

Unlike *Hale*, in which there were previously reported incidents, including reports specifically involving the subject product, Sloan did not receive any reports of ruptures involving Flushmate III, Generations 3s prior to the manufacture of the Subject Product in 2004, though the Flushmate III, Generation 3 had been on the market for three years by that time.   During that same time, Sloan received only three reports of bursting from the other Emabond welded product, Flushmate III, Generation 2, with no reported injuries.

Similar to *Sparks*, the fact that there may have been better materials or shapes for the vessel is too vague to establish actual knowledge of the specific design defect at issue. Additionally, Sloan's products were tested in an independent laboratory and the results

conformed with the applicable ASSE[6] standards.   (Doc. No. 115-3, 35:18-36:22).   In *Peters,* despite prior reports of incidents and reported concerns from internal engineers, the Court explained that the defendant must have actual knowledge of the specific design defect.   Here, the evidence, even construing it in the light most favorable to Plaintiff, does not establish that Sloan knew of the defective design defect—specifically, the tight radius of curvature leading to the vessels weld which was causing the Flushmate III, Generation 3 vessels to burst.

In sum, given the lack of evidence that Sloan knew of the problem with the radii, together with the fact that there were zero reports of bursting for the Flushmate III, Generation 3 prior to the manufacture of the Subject Product; Sloan's products were in compliance with federal regulations and industry standards; there had only been three reports of burst in the prior generation of Emabond vessel; and Sloan conducted regular and continuous testing, the Court finds that no reasonable jury could conclude that there is clear and convincing evidence that Sloan had actual knowledge of the specific defect. As such, punitive damages on strict liability will not be submitted to the jury.

**Punitive Damages – Negligence**

The standard for submission of punitives in a negligence action does not concern defendant's actual knowledge of the defect, rather the standard is if defendant *knew or had reason to know* a high degree of probability existed that an action would result in

---

[6] ASSE is the American Society of Sanitary Engineers, which governs pressure-assist devices.   Plaintiff's expert also testified that Sloan has not violated any federal regulations with respect to the design and manufacture of its products.   (Doc. 115-14, 55:5-57:12).

injury.  *In re NuvaRing*, 957 F. Supp. 2d at 1117 (E.D. Mo. 2013) (emphasis added).

There is no doubt that Plaintiff faces a considerable burden in proving a submissible case of punitive damages for negligence.   In addition to proving the requisite knowledge, Plaintiff must also demonstrate that the Sloan showed a "complete indifference to or conscious disregard for the safety of others."  *Jone,* 183 S.W.3d at 610.   However, on this motion, the initial burden lies with Sloan.   Sloan must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, even when construing the evidence in the light most favorable to the Plaintiff.

With specific regard to whether Sloan knew or should have known there was a high degree of probability that their actions would result in injury, there are several issues of fact that remain for determination.   For example, what Sloan knew about the propensity of the vessel to burst prior to the manufacture of the Subject Product, and whether the repair kit was effectively designed to remedy the defect.

In construing the facts most favorably to the Plaintiff, especially with respect to the various memorandums, increases to small radii in prior vessel generations, evidence of creep, and prior incidents (further discussed below), the Court cannot say at this time that, as a matter of law, Plaintiff will be unable to establish with clear and convincing evidence that Sloan knew or should have known that there was a high degree of probability that the Subject Product would burst in the field causing injury, and as such demonstrated a reckless indifference for the safety of others.

18

Therefore, Sloan's motion for summary judgment on punitive damages related to Plaintiff's negligence claims will be denied.   As discussed at oral argument, the denial of the submissibility of punitive damages at this stage does not mean that punitive damages will automatically go to the jury.   After the presentation of evidence at trial, the Defendant will once again have the opportunity to contest the submission of punitive damages on Plaintiff's negligence claims.

**Similar Prior Incidents**

As part of its summary judgment motion, Sloan argues that prior bursting incidents involving different Flushmate models are not relevant to Sloan's knowledge of risk.   In products liability cases, evidence of an accident similar in nature to that which injured the plaintiff may be admissible "(1) to prove the existence of a . . . defect, (2) to show that the defect or dangerous situation caused the injury, (3) show the risk that defendant's conduct created, and (4) to prove that defendant had notice of the danger." *Peters*, 200 S.W.3d at 9-10.   However, the evidence must be relevant and sufficiently similar to the incident so as to "outweigh concerns of undue prejudice and confusion of the issues." *Thornton v. Gray Auto. Parts Co.*, 62 S.W.3d 575, 583 (Mo. Ct. App. 2001. To be sufficiently similar, "each occurrence must be (1) of like character, (2) occur under substantially the same circumstances, and (3) result from the same cause." *Id.* However, the two occurrences do not need to be completely symmetrical. *Pierce v. Platte-Clay Elec. Coop., Inc.*, 769 S.W.2d 769, 774 (Mo. Banc 1989) (upholding the admission of evidence of two prior incidents where farm machinery struck unmarked wires resulting in a broken support pole to prove notice where the Plaintiff's injuries

19

resulted from a similar incident and upholding the exclusion of other incident reports of contact between farm machinery and wires which did not result in a broken support pole).

Sloan contends that the prior bursting incidents are inadmissible to the extent Plaintiff uses them to prove that Sloan had notice of the danger because the products themselves are not substantially similar.   Sloan states that each model and generation had design changes, most notably the change from the vibration welding to EmaBond welding.   However, there appears to be a dispute among the experts as to the similarity between the products.   Sloan's expert contends that despite similar shapes and similar materials, the products are "readily differentiated," while Plaintiff's expert stated that the different vessels have similar components.   (Doc. No. 115-5, p. 11; *see* Doc. 121-11).

Sloan also contends that the cause of the bursting differed among the models, and that "[a]t times, vibration weld products separated directly at, or otherwise very near, the weld joint due to voids, under-welding, and other reasons."   (Doc. 114, p. 16).   While this may be reason to exclude some of the prior incidents, it does not necessarily preclude all prior incident reports.

There is insufficient evidence in the record at this time to decide this issue as a matter of law, and it would be premature for this Court to exclude evidence of all prior incidents based on Defendant's contention that the products were not substantially similar, and that Plaintiff will not be able to demonstrate any similarity between the products and the reports in connection with the trial.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is

**GRANTED in part** and **DENIED in part** as set forth herein.   (Doc. No. 111).

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 4th day of November, 2022.